GORDON (JAMES v.). See Case No. 7,181.

———

## Case No. 5,611.

### GORDON v. KERR et al.

[1 Wash. C. C. 322.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1806.

ATTAINDER—TREATY—EJECTMENT—LACHES—SURVEY.

1. The attainder laws of Pennsylvania, and the authority of the legislature over cases which arose under them, in consequence of the stipulation in the treaty of peace with Great Britain, and the recommendation of congress, in conformity therewith, that the states should revise their confiscation laws.

2. The stipulations in a treaty between the United States and a foreign nation, are paramount to the provisions of the constitution of a particular state, of the confederacy.

3. The lessor of the plaintiff, who has a regular paper title, cannot be displaced, unless the defendant in the ejectment has a better title, either legal, or such an equitable one as a court of equity would sustain.

[Cited in Neill v. Keese, 5 Tex. 123.]

4. The laches of the defendant, in not executing a special warrant, from 1755 to 1765—his entire silence and acquiescence, from that time until still later, when an unauthorized surveyor was called upon to do it; is sufficient to defeat every pretence of equity, against a legal title in a fair bona fide purchaser, without notice.

5. The rule in Pennsylvania is, that if A, who has a warrant, do not use due diligence to have it surveyed, he loses his priority against another warrant holder, who has more vigilance, and who without notice obtains the first survey.

6. The prevalence of the Indian war, before the Revolution, is no excuse for a neglect by the holder to have a warrant executed, beyond the period when the war terminated.

7. A survey made by a deputy surveyor belonging to a different district from that in which the survey is made, although specially authorized to make it, by an order from the surveyor general, is not valid, and cannot be given in evidence, either as an execution of the warrant, or as evidence per se, to show the location of the warrant, being made on ex parte evidence. But the surveyor who made it, may use it as a memorandum, to show how the land might be located, from the calls of the warrant.

This was an ejectment [by the lessee of Harry Gordon against Kerr, Clossam and Lowry] to recover 299 acres of land. The plaintiff's title was as follows: On the 17th of March, 1762, a warrant for 2000 acres of land was granted to Richard Peters, in consideration of services rendered to the proprietaries; and it recited a prior warrant, dated in 1754, which had not been executed. On the 2d of May, 1762, this warrant was surveyed, so as to comprehend the land in question; and on the 13th September following, it was duly returned. On the 14th of April, 1770, Richard Peters, in consideration of 2000 acres of land, granted him by the proprietaries, in another place, released to them, as joint tenants, his right to the land thus surveyed for him. On the 17th of May, a grant was made to Harry Gordon, (to whom the lessor of the plaintiff is heir at law,) for the above land surveyed for Mr. Peters, in consideration of £900. Harry Gordon devised the land in question to his eldest son, who dying without issue, it descended to the lessor of the plaintiff. The same evidence in this as in the former cause,—see Gordon v. Holiday [Case No. 5,610],—to prove that the father of the lessor of the plaintiff was christened and known by the name of "Harry," and not "Henry." The defendant set up a title to the land in question, under a warrant to James Rankin, dated 3d February, 1755, for 300 acres, to include the White Hunter's Cabin, and to adjoin the land of James Lowry; who, on the

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

same day, took out a warrant for 300 acres, to include Frankstown. It did not appear, that any attempt was made by Rankin, to get his warrant executed, until the year 1765; when his agent Lowry, applied to a deputy surveyor to execute it. When on the ground, the surveyor was directed to lay the warrant on the land in question, which he refused to do, because it had been before surveyed for Mr. Peters. The agent refused to have it executed on a piece of land surveyed for a Mr. Lyons, lying between James Lowry's survey and that of Mr. Peters. Nothing therefore was done in the business; and it did not appear that Rankin, ever after, did any thing to complete his title. It appeared that Armstrong was the agent of Mr. Peters, and that Morris was his agent to survey other warrants; and that in 1761 he had notice that Rankin had a warrant for the land where the White Hunter's Cabin was; and which it was proved was within the survey made for Mr. Peters. The defendant offered a survey under Rankin's warrant, made by Harris, a deputy surveyor, for a different district from that in which this land lies, under a special authority from the surveyor general; who directed to lay it off according to the calls of the warrant, and such evidence as might be offered on the ground. This was objected to, as a survey; because made by a deputy out of his district, which is against the law of the state; and as a deputy constituted for this district, it was said to be equally ineffectual; since, no deputy could be appointed by the surveyor general, without the approbation of the governor. THE COURT declared that this was not a legal survey, and therefore could not be read as such; neither could it be used as evidence per se, to show the location of the warrant; because it was made on ex parte evidence. But that Mr. Harris, the surveyor, might use it as a memorandum, to show the jury how the land might be located, from the calls of the warrant itself.

On the part of the defendant, it was objected, that the plaintiff had no title to the estates of his father, having been confiscated. They argued as formerly, that "Harry" and "Henry" are the same name, and as an additional authority to those cited in the former case, relied upon 2 State Trials, 310, where Henry Martin, being excepted out of the act of oblivion, urged that his name was "Harry Marten," but not allowed. That if no misnomer, then his attainder was valid, and could not be, and was not, set aside by the act of the 31st January, 1783, as against the purchaser under the attainder. 2d. It was argued, that the defendant was prevented by the Indian war, which continued till the treaty of Paris, in November, 1762, and indeed afterwards, till 1764, when peace was concluded with the Senecas and some other tribes. That the refusal of the surveyor, in 1765, to execute this warrant, completed Rankin's title, as much as if he had obtained a survey; and at any rate, Gordon was bound by the notice to the agent of Mr. Peters. These points were all disputed by the plaintiff's counsel, who relied; that the equity set up by the defendant's counsel, was destroyed by the long forbearance on the part of Rankin, to get his tract surveyed.

WASHINGTON, Circuit Justice (charging jury). In the case of Gordon v. Holliday [Case No. 5,610], I entertained some doubts, whether "Harry" and "Henry" were the same name; my mind rather inclined to the opinion that they were. I thought myself however authorized, in laying hold of a legislative declaration, that they were not the same names, and that a misnomer had taken place, sufficient to invalidate the attainder. This opinion, in the present cause, has been combated by an argument not thought of, or used in the former, which is, that if there was in fact no misnomer, the attainder was complete, and the sale of Gordon's estate under it so entirely valid, that the legislature could not, in 1783, defeat it directly, or by the declaration of an opinion, which was solely of a judicial nature. This objection, I suppose, is founded upon the constitution of the state, though it was not read, nor referred to. But be this as it may, even that constitution must yield to the treaty of peace, which is supreme. The fifth article stipulates, that congress should earnestly recommend to the states, a revision of their confiscation laws, so as to render them consistent with justice and equity, &c. and should also recommend to them the restitution of confiscated estates. This was not considered as an idle provision, but was intended to be effectual; provided the different states, or any of them, felt disposed to comply with the recommendation. If the states thought proper to restore, their power to do it grew out of this treaty; and so far neutralized any article of their constitution, which prohibited, in other cases, the exercise of such right. The state would no doubt feel itself compelled to make compensation to the purchasers, but their power to restore could not, I think, be questioned. If they could restore absolutely, they could do any other act short of that, and tending to better the situation of those whose estates had been confiscated; and of course, to declare that in this case a misnomer had taken place. I think that this law amounts to the granting of a new trial, and the setting aside a former attainder.

As to the rights of the parties in this cause, this will depend upon the facts, which have been already stated. Upon them, the lessor of the plaintiff, appears with a regular and unexceptionable legal title to the land in question. It will not do, after this, for the defendant to rely upon his possession; but he must show a better title, either legal or equitable. When I say equitable, I speak in reference to the laws and usages of this state. If he rely upon an equitable title, it must

be such as a court of equity would sustain. What is it? A special warrant, dated in 1755, kept in his pocket till 1765; and then an ineffectual attempt made to survey it; which failing, we hear nothing further of it, or of Rankin's pretensions, until the order given to Harris to survey it. The rule in this state, as it seemed agreed at the bar, is, that if a man, having a warrant, do not use due diligence to survey it, so as to afford notice to others, he loses his priority. We feel well disposed to adopt this rule, because it is highly reasonable. I presume, however, that if, during the suspension, a third person, with notice of the warrant and its location, should survey the land, he would lose the benefit of his vigilance, in consequence of that notice; and for this reason it was, I suppose, that the notice of Morris in 1761, was so much relied upon by the defendants' counsel. But there is nothing in that, even if the notice had been more precise, because notice to Mr. Peters, would not affect Gordon, who purchased without notice. 2 Fonb. 152. The delay of Rankin is attempted to be excused, on account of the Indian war. You have heard what was the degree of danger, in surveying in this part of the country, after 1758; and you can determine on the validity of the excuse. But, after the survey for Mr. Peters in 1762, what prevented Rankin from contesting his right to the land? This survey was returned in 1762. The agent of Rankin had express notice of it in 1765; yet no caveat was entered; no objections made; no complaint to the proper tribunal, of the supposed misconduct of the deputy surveyor, in not executing the warrant in 1765. The whole subject rests in profound quiet, and concealed from the light, until the year 1774, when an innocent man, not suspecting this or any other sleeping title to the land, pays £900, and obtains a grant. What kind of figure would this defendant make in a court of equity, with his dormant title, against a fair bona fide purchaser, without notice, and shielded by a legal title? If, then, I have stated the evidence in the cause truly, there can be no doubt that the title of the defendant, cannot prevail against that of the lessor of the plaintiff.

Verdict for plaintiff.